Laurence C. Osborn (State Bar No. 155209)
Kenneth F. Spencer (State Bar No. 140982)
**BAKER, KEENER & NAHRA**
633 West Fifth Street, 49th Floor
Los Angeles, California  90071
Telephone:  (213) 241-0900
Email:  losborn@bknlawyers.com
          kspencer@bknlawyers.com

James Robert Noblin (State Bar No. 114442)
**GREEN & NOBLIN, P.C.**
4500 East Pacific Coast Highway, Fourth Floor
Long Beach, California  90804
Telephone:  (562) 391-2487
Email:  gnecf@classcounsel.com

*Attorneys for Plaintiff*
Packaging Systems, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACKAGING SYSTEMS, INC., a California Corporation,<br><br>           Plaintiff,<br><br>vs.<br><br>PRC-DESOTO INTERNATIONAL, INC., a California Corporation; and PPG INDUSTRIES, INC., a Pennsylvania Corporation,<br><br>           Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF BASED ON:**<br><br>  **(1)** **Monopolizaton, 15 U.S.C. § 2**<br>  **(2)** **Attempted Monopolization, 15 U.S.C. § 2**<br>  **(3)** **Tying, 15 U.S.C. § 1**<br>  **(4)** **Tying, Cal. Bus. & Prof. Code §§ 16720, 16727**<br>  **(5)** **Secret Rebates, Cal. Bus. & Prof. Code § 17045**<br>  **(6)** **Intentional Interference with Prospective Economic Advantage**<br>  **(7)** **Unfair Competition, Cal. Bus. & Prof. Code § 17200**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Packaging Systems, Inc. does hereby complain and make the following allegations against Defendants PRC-DeSoto International, Inc. and PPG Industries, Inc.

## SUMMARY OF THE CASE

1.      As a single enterprise, Defendants dominate the manufacture of aerospace sealants.  These aerospace sealants are specialized products designed to meet the exacting performance standards required to fly safely and efficiently.  They are also difficult to work with because that they are made up of different compounds that, when mixed for use, must be applied quickly and safely by personnel trained in the process.  For decades, Defendants' aerospace sealants were marketed and delivered to end-user customers by means of a dual distribution system.  Under that system, Defendants would sell directly to end-user customers but would also sell to distributors, sometimes called resellers, who would, in turn, also sell to end-user customers, sometimes in competition with Defendants.  End-users desire particular packaging of their aerospace sealants, frequently in specialized kits called "injection kits," for ease of application.  Consequently, some resellers, such as PSI, repackaged Defendants' aerospace sealants in order to sell them to end-users.  Defendants have known of and accepted the repackaging of their aerospace sealants into injection kits by repackaging resellers such as PSI for decades, until August, 2016.

2.      In order to maintain their monopoly and to prevent the potential competitive threat represented by Plaintiff, in August, 2016, Defendants announced a policy prohibiting the repackaging of their aerospace sealants.  Partly because the aircraft industry specifies which products can be used on aircraft and the manner in which they can be used, this prohibition has been effective in precluding end-users from purchasing aerospace sealants that had been manufactured by Defendants but repackaged by resellers.

3.     The prohibition on repackaging thus precluded any reseller from offering effective competition to Defendants in the market for the distribution of aerospace sealants.  As a result, end-users have been and will continue to be deprived of the service varieties and other options provided by resellers, and prices to end-users will no doubt increase more rapidly and more steeply than they otherwise would in the absence of the prohibition.  These consequences of Defendants' newly announced prohibition against repackaging thus will harm end-users by compelling the end-users to pay higher prices and purchase only from Defendants.  By these means, end-users will be deprived of the greater variety of service offerings provided by resellers, with no alternative but to use Defendants' sluggish, one-size-fits-all approach to customer service.4.     The prohibition on repackaging will also vastly reduce Plaintiff's sales of Defendants' aerospace sealants, a business that, prior to the prohibition, generated around ten million dollars in revenue annually.  Consequently, Plaintiff is entitled to relief from Defendants for that grievous harm, as alleged below.

**PARTIES**

5.     Plaintiff Packaging Systems, Inc. ("PSI") is a corporation incorporated under the laws of the State of California, with its headquarters located within this judicial district at 26435 Summit Circle, Santa Clarita, CA 91350.

6.     Defendant PRC-DeSoto Internatonal, Inc. ("PRC") is a corporation incorporated under the laws of the State of California with its headquarters located within this judicial district at 12780 San Fernando Road, Sylmar CA 91342 and with its primary physical plant located at 24811 Avenue Rockefeller Valencia CA 91355.  PRC is a wholly-owned subsidiary of Defendant PPG Industries, Inc.

7.     Defendant PPG Industries, Inc. ("PPG") is a corporation incorporated under the laws of the State of Pennsylvania with its headquarters located at One PPG Place, Pittsburgh, PA 15272, and publicly traded on the New York Stock

Exchange under the ticker symbol PPG.  In 1999-2000, PPG acquired PRC-DeSoto.

8.    Since 1999, PRC-DeSoto and PPG have operated in concert under the brand name PPG Aerospace.  The purpose of establishing that brand name was to reinforce "key strengths of combining the PRC-DeSoto and [PPG's] transparencies business segments under one aerospace strategic business unit." Since then, the PRC-DeSoto and PPG employees and agents that undertook the conduct alleged below did so under the name of PPG Aerospace.  Consequently, Defendants often shall be referred to below by that name.

9.    Each Defendant is legally responsible either directly or vicariously (under theories of causation, agency, ostensible authority, conspiracy, or aiding and abetting) for all of the illegal misconduct alleged in this Complaint.

## JURISDICTION AND VENUE

10.   Jurisdiction is proper in this Court because this litigation arises under federal law, specifically, the Sherman Act 15 U.S.C. §§ 1 & 2, and the Clayton Act, 15 U.S.C. § 14.  This Court also has jurisdiction over the California state law claims alleged pursuant to its pendant and ancillary jurisdiction power.

11.   This Court has personal jurisdiction over PRC because it is a California corporation with its principal place of business in California and thus is subject to personal jurisdiction in California.  As for PPG, it is registered to conduct business in California, has sufficient minimum contacts in California, or has otherwise intentionally availed itself of the markets within California, through the promotion, sale, marketing and distribution of products and services in California, to render the exercise of jurisdiction by this Court proper and necessary.

12.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 139l[c] because Plaintiff resides in this District, Defendant PRC resides in this district, Defendants conduct substantial business in this District, and a substantial

part of the events giving rise to Plaintiff's claims occurred in this District, specifically at the offices of PSI, located at 26435 Summit Circle, Santa Clarita, CA 91350 and at the offices of PRC, located at 12780 San Fernando Road, Sylmar CA 91342.

## COMMON FACTUAL ALLEGATIONS

### The Nature of the Aerospace Sealant Industry

13.     Many parts of contemporary aircraft need to be sealed for a variety of reasons.  For example, fuel tanks are sealed to prevent leakage and corrosion.  For another example, access doors on the aircraft are sealed, and outer surfaces of the Aircraft have sealant to smooth the aerodynamic flow of air over those areas of the aircraft during flight.  In addition to fuel tanks and access doors, sealants are used on other parts of the aircraft, including metal exterior surfaces, weight-bearing floors, gaskets, and windshields.  In addition to preventing leakage and corrosion, in particular applications, sealants are used to improve air flow, preclude moisture, prime, coat, and strengthen materials.  Other important dimensions of sealants are their adhesion, weight, electrical conductivity, strength, viscosity, flame resistance, working time, and environmental impact upon disposal.  Also important to the proper functioning of an aerospace sealant is resistance to high and low temperatures, low pressures, inclement weather, ultraviolet light, noise, vibration, abrasion, moisture, fatigue and high g-forces.

14.     Aerospace sealants come in a variety of forms, typically a paste, liquid, or film.  They are made up of complex chemical compounds, but the most important compounds in aerospace sealants that are sold by PPG Aerospace are called polysulfide sealants.

15.     To be effective, aerospace sealants must be applied in the proper manner.  Typically, the surface to which an aerospace sealant will be applied must be cleaned of all contaminants by use of a solvent and then thoroughly dried.  A properly mixed aerospace sealant must then be applied, typically by means of a

specialized tool, in a thin layer to the components to be sealed.  Then excess aerospace sealant must be smoothed out into a fillet.  After it is mixed, each aerospace sealant features its own unique working time, which varies by temperature and humidity, during which it can be applied.  After the working time has passed, any portion of the aerospace sealant that was mixed but not applied is deemed wasted and disposed of.

16.    The need to mix an aerospace sealant arises from the fact that, after its components come into contact with each other, they can be worked for only a relatively short period of time – as short as one-half hour for certain aerospace sealants.  The components of aerospace sealants tend to be mixed in one of two ways.  First, the end-user can purchase the sealant components in bulk and mix them on their own to obtain the aerospace sealant in a form ready to be applied.  Second, the customer can purchase what is known as an injection kit.  Each kit is a ready-to-use disposable cartridge-based system that stores, mixes and applies multiple component sealants that require dynamic mixing.  Using a kit fulfills the need for accurate proportioning of the sealant component materials since the premeasured components are stored in different compartments within the cartridge.

In the past, as alleged below, those purchasing sealant components in bulk from manufacturers like PPG Aerospace could purchase in quantities as large as 50 gallon drums, whereas injection kits typically hold between 1 and 20 ounces of materials.

17.    Military aircraft in the United States must be operated and maintained in accordance with specifications from the applicable branch of the United States Armed Forces, which are called "milspecs" in industry parlance.  For a particular aircraft model, the milspecs articulate which sealant or sealants are acceptable, how they should be applied, and other characteristics of the product that must be met.

18.    Similarly, commercial aircraft in the United States must be operated and maintained in accordance with specifications by the manufacturer of the aircraft, typically Boeing, specifications that are informed by Wright Patterson Air

Force Base or FAA, which does the testing for those requirements.  During the production of the aircraft, the manufacturer puts out an engineering bulletin, indicating the performance parameters the aerospace sealant must meet in the particular application described.  Then aerospace sealant manufacturers submit samples for testing at Wright Patterson or FAA.  Next, the manufacturer issues a QPL, a qualified product list, indicating which sealants, by manufacturer and product title, are deemed to comply with the specifications.  The Boeing's QPL, which is highly influential in the industry, is also known as the BMS. End-users will virtually never use an aerospace sealant not listed on the QPL for the aircraft out of obvious concerns for safety, liability, and warranty.

19.    General aviation aircraft in the United States must be operated and maintained in accordance with specifications by the manufacturer of those aircraft, specifications which are also informed by Wright Patterson or FAA requirements. Frequently, smaller airline manufacturers in the United States, such as Cessna, Gulfstream, and Piper will "piggyback" on Boeing's BMS by including on their own QPL only those aerospace sealants listed on the analogous item for Boeing's BMS.

20.    Among the three segments of aerospace sealant users, commercial aircraft constitute by far the largest in terms of quantities and dollar volumes purchased during the assembling of new aircraft.  Within that segment, in turn, the vast majority of sales are made to a) maintenance and repair organizations ("MROs") responsible for the upkeep of various aircraft fleets and b) overhaulers, those who overhaul existing aircraft.  Also the Military repairs its own aircraft with sealants.

### There Is a Distinct Market for the Production of Aerospace Sealants in the United States

21.    The production of aerospace sealants constitutes a relevant product market in this case.  Owners and operators of military, commercial or general

aviation aircraft, have no reasonable substitute for aerospace sealants. Although there are many other industrial sealants, none are suitable for use on aircraft due to the many requirements exclusive to aerospace sealants resulting from the unique nature of aircraft and the specialized uses for which aerospace sealants are employed.

22.     Other industrial sealants do not need to meet the same performance standards as do aerospace sealants, thus rendering them unacceptable for use on aircraft. For example, fuel tank sealants must be able to resist the highly corrosive qualities of jet fuel while other industrial sealants typically do not. For another example, sealants used on the exterior of aircraft must render the surface to which they are applied more aerodynamic than the unsealed surface, but there is no such requirement for other industrial sealants. As a last example, because aircraft take off and land at ground level, but travel at high altitudes, the temperature and pressure ranges over which an aerospace sealant must retain functionality is far wider than is true for most industrial sealants.

23.     Historically, the price of aerospace sealants has been completely independent of the price of other industrial sealants.

24.     The military, commercial aircraft, and general aviation sectors all recognize that aerospace sealants are a separate economic entity, discussing and analyzing such sealants frequently without reference to any other type of industrial sealant.

25.     Customers for aerospace sealants rarely have much use for other industrial sealants in their business, for they tend to concentrate on the aerospace sector. For example, most commercial aircraft are owned by airlines or freight carriers that do not typically engage in businesses that consume other forms of industrial sealants.

26.     "Elasticity" is the term used to describe the sensitivity of the amount demanded of a product to a change in the price charged for it. The more sales of a

8

certain product would decline as the price of that product increases, the more elastic are the prices of that product. Conversely, inelastic pricing exists when the amounts sold of a certain product do not decline significantly even when the price of that product increases significantly. In other words, when customers have few or no practical alternatives to a given product in the form of cheaper products of similar quality and functionality, they will pay higher prices for the product they need with relatively little reduction in the amount of the product they purchase.

27.     Pricing for aerospace sealants is highly inelastic, in large part because there are no adequate substitutes for the products.

28.     The geographic boundaries of the market for the production of aerospace sealants are those of the United States. Indeed, from the inception of the aerospace sealant industry, aerospace sealants were overwhelmingly produced in the United States. All the significant polysulfide sealant manufactures were based in California back then, and still are to this day. The reason for this history is that there were 30 plus airframe companies based in the United States in prior decades, with over 10 of those located in California alone. Because aerospace sealants must meet the specifications of the United States military and United States aircraft manufacturers -- principally Boeing -- it is an insurmountable competitive advantage to have production facilities located in the United States, where personnel from the producer of aerospace sealants can communicate with those purchasing the sealants and applying the sealants on aircraft, and where the facilities themselves and the products they produce can be inspected more easily by relevant government and business officials. In this regard, linguistic barriers to communications between producers outside the United States and users inside the United States also increase the difficulty of substituting foreign aerospace sealants for those produced in the United States. Further, for reasons of national security, the United States military would not accept a situation where a significant share of the market for production of aerospace sealants for military aircraft was located

outside of the United States.  Moreover, the transportation costs of shipping large quantities of aerospace sealants in a timely fashion via international commerce would fatally disadvantage any competitor to domestic aerospace sealant producers.  Consequently, no significant quantities of aerospace sealants used in the United States are shipped from outside the United States and never have been.

## PPG Dominates the Market for the Production
## of Aerospace Sealants in the United States

29.     As has been the situation for decades PPG Aerospace produces over 90% of aerospace sealants produced and used in the United States, with the remaining less than 10% now scattered among three companies: 3M, Royal, and Flamemaster.  More specifically, PPG Aerospace's revenues from sales of aerospace sealants in the United States has amounted to $500 - $ 800 million annually in recent years, while Flamemaster's has amounted to around $ 5 million, Royal's has amounted to around $ 2-3 million, and 3M's has amounted to around $ 1 or 2 million.  For many particular aerospace sealants for distinct applications, there is no producer other than PPG Aerospace.

30.     Monopolistic conduct that raises product prices above competitive levels would, under some circumstances, attract new entrants to the market until the monopolist no longer held the power to set supracompetitive prices. When there are significant barriers to entering a market, however, new entrants are less likely to enter the market in response to the lure of high prices and thus prices can remain supracompetitive indefinitely.

31.     High barriers to entry have prevented new entrants into the market for production of aerospace sealants.  Entry into the market for the production of aerospace sealants involves significant start-up capital expenditures. A new entrant would have to incur hundreds of millions of dollars in costs, including capital expenditures on plants and equipment, obtaining regulatory approvals, as well as for items such as transportation, electricity, infrastructure for distribution,

and labor. The equipment needed to produce aerospace sealants is custom-built and would mostly likely take several years before it could become operational. Manufacturing of aerospace sealants must be technologically advanced to ensure they meet milspecs and specifications by aircraft manufacturers.  The investment in aerospace sealant manufacturing itself is sunk in that the capital has little to no alternative value.  Further, some of the producers of aerospace sealants, like PPG Aerospace, already maintain distribution networks, which not only make products available, but also provide information about the products and new product developments to customers.   Consequently, existing firms have advantages over new entrants in terms of economies of scale, vertical integration, geographic spread and market profile.

32.     The barriers to entering the market for the production of aerospace sealants are also strengthened by the intellectual property held by current producers.  Aerospace sealants are technically difficult products to manufacture, store, and ship, a process subject to numerous trade secrets.  A new entrant to the market would have to recreate that knowledge on its own in such a way that would ensure it would not be sued for violating the intellectual property rights of incumbent producers and that end-users would not be concerned that the new entrant lacked sufficient intellectual property to manufacture acceptable aerospace solvents.

33.     The misconduct alleged herein constitutes another barrier to entering the market for the production of aerospace sealants because such conduct would require any new entrant into the market for production to also enter strongly the market for packaging and distribution, thus raising the cost of entry yet further.

34.     PRC engaged in a campaign of acquisition of other aerospace sealant manufacturers to enhance their power in the market for the production of aerospace sealants.  PRC, by itself without the DeSoto moniker, was one of the original aerospace sealant manufacturers.  In 1953, it introduced the first jet fuel-

resistant sealant.  During the early 1980s, PRC acquired a competing aerospace sealant manufacturer called Proseal.

35.     PPG and PRC have also engaged in a campaign of acquisition in markets related to the market for the production of aerospace sealants. In 2000, PPG acquired a company called ICI Aerospace Industries, a leading manufacturer of aerospace paint strippers. In 2006, PPG Aerospace acquired Sierracin, a leading manufacturer of aircraft canopies.  In 2012, PPG bought Spraylat Corp, a coatings company. Also in 2013, PPG Aerospace acquired Deft, a leading manufacturer of aerospace coatings.  In the late 1980s, PRC acquired a company called DeSoto International, a leading manufacturer of aerospace paints.  PPG itself started out as "Pittsburgh Plate & Glass," a leading manufacturer of aircraft windows since before World War II.  Acquiring these companies in related industries reflected PPG Aerospace's desire to dominate the markets in which it operated and allowed it to offer "one-stop-shopping" for a variety of aerospace products to customers who needed to purchase all of them.  As further alleged below, PRC acquired a company called "SEMCO," which manufactured injection kits for the application of sealants.  And, of course, PPG acquired PRC-Desoto itself in 2000.

**PSI and Others Competed with PPG Aerospace in the Distribution of Aerospace Sealants**

36.     Like many companies, PPG Aerospace engaged in a practice known as "dual distribution," pursuant to which it sold aerospace sealants directly to end-users but also sold them to resellers who, in turn, sold PPG Aerospace's sealants along with other brands of aerospace sealants to end-users in competition with PPG Aerospace.

37.     Although aerospace sealant manufacturers can make and store sealants in virtually any quantity they desire, many end-users demand aerospace sealants in smaller sizes.  An important consideration in this regard is that, as alleged above, once the different elements of an aerospace sealant are mixed, the

entire mix must be used within a relatively short "working time;" any portion of the mix not used within that time, must be discarded.  In the 1950s and afterwards, as these products were developed, the most common sizes sold by manufacturers and distributors to end-users, were containers in quart, pint, half-pint and injection kit sizes.  Smaller jars for touch-up use were sold more rarely.

38.     In the 1950s, a group of engineers at an airframe manufacturer designed the SEMCO kit, as alleged above.  That intellectual property covering the kit was then licensed to the SEMCO itself, which sold the injection kits to manufacturers and resellers of aerospace sealants, who would fill the different areas of the tube portion of the kit with the separate components of the sealant for the customers to mix upon use by pushing the plunger portion of the kit.   SEMCO injection kits come in a variety of sizes, but 2.5 ounces and 6 ounces were and are particularly popular.  In the 1960s, PRC bought SEMCO.

39.     The SEMCO injection kit was patented.  When the patent expired two or three decades ago, other companies started manufacturing competing kits.  Now, the main alternatives to the SEMCO kit are those manufactured by a company called Techon.

40.     PSI was founded in the early 1976 and began operating as a distributor and reseller of aerospace sealants.  Over the course of time, PSI grew and improved its business operations.  A key element of its business distributing aerospace sealants was repackaging them.  In the repackaging process, PSI would order and obtain 50 gallon drums and 5 gallon pails of aerospace sealant materials and fill injection kits made by first, SEMCO, and later other companies as well, so that the end-user customer could purchase ready-to-use kits filled with aerospace sealant components.  The larger drums and pails were most efficient for this repackaging process, as they could be attached to a drum pump that would rapidly fill kits with the desired amount of material.  By 2015, PSI's annual revenues from the sale of PPG Aerospace's sealants approximated 10 million dollars.

41.    PSI's revenues from repackaging and selling PPG Aerospace sealants grew in large part because of PSI's dedication to customer service.  PSI personnel took the time to learn their customers' needs and counsel customers on best practices designed to increase efficiency and reduce waste.  PSI also invested heavily in inventory so that it had sufficient quantities of the wide variety of aerospace sealant products necessary to ship to customers quickly.  Frequently, customers could obtain a given quantity of a given PPG Aerospace sealant more quickly from PSI than from PPG Aerospace itself.

42.    Repackaging is a time and labor-consuming process that many end-users will not engage in on their own.  Repackaging requires workers to open the larger containers of aerospace sealant materials.  Workers must wear gloves during this process and be careful to avoid letting the materials touch their skin.  Further, they must be experienced in handling the materials to avoid an inordinate amount of material waste.  Lastly, repackagers must be knowledgeable about and prepared for the disposal of left-over sealant, which must be treated as a form of hazardous waste.  Avoiding these obstacles was yet another reason that many customers purchase aerospace sealants only in kit form.

### The Market for the Distribution of Aerospace Sealants Is Separate from the Market for Producing Them

43.    The market for the distribution of aerospace sealants is distinct from the market for the production of aerospace sealants.  One clear demonstration of this fact is industry history, in which many companies, such as PSI, have distributed aerospace sealants without producing them. Further, before the misconduct at issue in this case, the barriers to entering the market for the production of aerospace sealant were inapplicable to the distribution of aerospace sealant.  Consequently, a number of companies that distributed other products to the aerospace industry would distribute aerospace sealants as well as part of the full-line of products they offered to their aerospace customers.

44.     The geographic boundaries of the market for the distribution of aerospace sealants were and are also those of the United States.  Because aerospace sealants must meet the specifications of the United States military and United States aircraft manufacturers -- principally Boeing -- it is an advantage to distributors of the product to have in-person contact with United States military and aircraft personnel.  Further, distributors must be very familiar with the specification and QPL process, a familiarity that would be difficult to achieve from abroad.  In this regard, linguistic barriers to communications between potential distributors outside the United States and users inside the United States would increase the difficulty of foreign distributors operating here.  Further, the United States has its own unique laws and regulations applicable to the aerospace industry.  Consequently, distribution of aerospace sealants in other countries is not a reasonable or feasible substitute for distribution of aerospace sealant within this country.  For all these reasons, there has never been a significant amount of aerospace sealant distributed in this country by a foreign-based distributor. American distributors of aerospace sealants do in fact sell them in countries other than the United States, but such sales are typically governed by the laws of those other countries.  Moreover, the fundamental point remains that such sales provide no competitive discipline on the prices charged and services offered on aerospace sealant sales within the United States, and thus the United States is a distinct market for such sales.

**PPG Aerospace Recently Barred**
**the Repackaging of Its Aerospace Sealants**

45.     On August 16, 2016, PPG Aerospace announced in a document attached hereto as Exhibit A that the repackaging of its aerospace sealants was prohibited and that it would refuse to sell to any reseller violating that prohibition. That prohibition had all the greater force because it meant that any customer using PPG Aerospace sealant that had been repackaged could be accused of acting in

violation of the applicable specifications and thus would not be using a product on the QPL.  Many customers would not consider putting themselves in that position: risking termination of their services by the company owning and/or operating the aircraft and the risk of liability inherent in using non-QPL products on an aircraft. The announcement in Exhibit A was confirmed by an email of August 31, 2016 from PPG Aerospace to PSI, including an earlier email from PPG Aerospace to PSI of August 26, 2016, attached hereto as Exhibit B.

46.     Since PPG Aerospace announced its ban on repackaging, the amount of repackaged aerospace sealant sales by resellers has been  vastly reduced. Some of those resellers bought through PSI, and thus PSI has lost substantial profits as a result of PPG Aerospace's prohibition against repackaging and is certain to lose considerably more in the future.

**PPG Aerospace's Repackaging Ban Has Created a Barrier to Entry in the Market for the Distribution of Aerospace Sealants**

47.     Few if any potential entrants into the business of distributing aerospace sealants are now likely to enter the business as a result of PPG Aerospace's prohibition against repackaging its aerospace sealants.  To the contrary, existing resellers are likely to begin exiting the business.  With the prohibition in place, any reseller could not reasonably expect to generate significant sales on a profitable basis.

**Interstate Trade and Commerce**

48.     PPG Aerospace's conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this Judicial District.  PPG Aerospace sealants are sold in virtually every state in the Union, shipped from PPG Aerospace's facility within this Judicial District.  Similarly, PSI and a number of other resellers shipped PPG Aerospace sealants to customers in many other states from their facilities within this Judicial District.

**<u>COUNT ONE</u>**

**(Monopolization under Section Two of the Sherman Act, 15 U.S.C. § 2)**

**(Against all Defendants)**

49.     PSI incorporates by reference each and every allegation above as if set forth in full at this point.

50.     PPG Aerospace not only has monopoly power in the market for the production of aerospace sealants but also has monopoly power in the market for distribution of aerospace sealants.  More specifically, PPG Aerospace sells and has sold for a number of years, over 90% by dollar volume of the aerospace sealants distributed in the United States.

51.     Over the years, PPG and PRC have engaged in a campaign to maintain their monopoly position in the market for the distribution of aerospace sealants by acquisition.  Specifically, they acquired many Distributors/resellers and turned them into units within the manufacturing company called "application support centers" ("ASCs"), which continue to sell and sometimes repackage aerospace sealants, only as units within PPG Aerospace instead of as independent entities.

52.     That 90% figure is certain to rise as a result of PPG Aerospace's prohibition against repackaging, as customers who purchased aerospace sealants – particularly in kits -- from PSI and other repackaging resellers have already switched to PPG Aerospace as their source for aerospace sealants in the interim. As alleged above, this exclusionary conduct by PPG Aerospace has created an impenetrable barrier to entry into the market for the distribution of aerospace sealants.  Consequently, the prospect that resellers of aerospace sealants could continue to provide a degree of competitive discipline on PPG Aerospace's activity as a distributor of aerospace sealants has been seriously eroded.

53.     In its announcement of the prohibition against repackaging attached hereto as Exhibit A, PPG Aerospace contends that the ban was adopted in

furtherance of quality control, but that rationale is pretextual.  Repackaging distributors/resellers had been repackaging PPG Aerospace sealants for years without significant quality issues.  Further, as alleged above, many PPG Aerospace sealants are repackaged by units denominated as ASCs.  These ASCs typically follow the same procedures in repackaging aerospace sealants after acquisition by PPG Aerospace as they did before.  In other words, the approach to repackaging that PPG Aerospace implausibly decided in August 16, 2016 was a threat to quality was, in fact, the same approach undertaken by distributors/resellers and ASCs for years, including the exact same personnel who repackaged as distributors/resellers and then repackaged in the identical way for PPG Aerospace as ASCs.  Further, the allegations in Count Two below concerning PPG Aerospace's specific intent to monopolize the distribution of aerospace sealants further establishes that PPG Aerospace's quality control rationale for its ban on repackaging is pretextual.

54.     As a result of this misconduct, PSI was harmed by losing profits on aerospace sealant sales that it would have made but for PPG Aerospace's misconduct.  The precise amount of that harm is currently unquantified, and it is mounting daily, but is subject to proof at trial or other appropriate proceeding.  Pursuant to 15 U.S.C. § 15, PSI is entitled to treble that amount in damages, as well as costs of suit, including a reasonable attorney's fee.

55.     Because PPG Aerospace's prohibition against repackaging is ongoing, continuing to inflict harm on repackaging resellers such as PSI, PSI is entitled to a permanent injunction forbidding PPG Aerospace to prohibit repackaging and ameliorating the effects of its improper prohibition.

## COUNT TWO

**(Attempted Monopolization under Section Two**

**of the Sherman Act, 15 U.S.C. § 2)**

**(Against all Defendants)**

56.    PSI incorporates by this reference each and every allegation above as if set forth in full at this point.

57.    In the alternative, if PPG Aerospace's power in the market for the distribution of aerospace sealants falls short of the level required to establish monopoly power currently, it is strong enough that its prohibition against repackaging raises a dangerous probability of PPG Aerospace achieving a monopoly in that market.

58.    PPG Aerospace effectuated its prohibition against repackaging with the specific intent to monopolize the market for the distribution of aerospace sealants, an intent also evident from its earlier conduct in the market.  As alleged above, PPG Aerospace had a practice of acquiring distributors/resellers, specifically distributor/resellers that had grown large enough in terms of sales to present a potential future threat to PPG Aerospace's dominance of the distribution market.  PSI has been a repackaging distributor/reseller for years, growing to the second largest seller of aerospace sealants on the West Coast, behind only PPG Aerospace itself.  PPG Aerospace has expressed interest in acquiring PSI and turning it into an ASC more than once, but PSI demurred.

59.    Throughout the years, PPG Aerospace personnel would tell customers and potential customers that PSI and other resellers were not authorized to repackage, even though the personnel knew there was no policy against reselling.  They did so for the purpose of garnering those customers for PPG Aerospace, taking them away from repackaging resellers such as PSIs.   These sorts of efforts by PPG Aerospace with respect to PSI came to a head in 2001 and again in 2012, but were a recurring phenomenon at other times.

60.     Starting in 2000, PPG Aerospace began reducing the volume discount it offered on bulk sales of aerospace sealants to reduce resellers' profit margins. Also, PPG Aerospace announced that it was increasing the price of 50 gallon drums and 5 gallon pails by 50% while the price of smaller quantities was being increased by very small percentages.  As a result, it became cheaper for repackaging resellers to buy a bulk quantity from PPG Aerospace, say 50 gallons, in small quart or gallon containers equating to 50 gallons total rather than a single 50 gallon drum, even though the historical pattern in this market, as in so many others, was that purchasers would receive a smaller per ounce price when they purchased a greater-sized container.  Then in 2007 when the above efforts didn't work in eliminating competition from resellers, PPG over the course of the next 4 or 5 years started increasing the percentage cost of quarts and gallons higher than pints, 2.5oz and 6oz injection kits during their annual price increases. The transparent motive of PPG Aerospace's price increase was to raise the cost of operations to repackaging resellers.  When that conduct failed to put a halt to repackaging by resellers, PPG Aerospace adopted the blanket prohibition on repackaging.

61.     As a result of this misconduct, PSI was harmed by losing profits on aerospace sealant sales that it would have made but for PPG Aerospace's misconduct.  The precise amount of that harm is currently unquantified, and it is mounting daily, but is subject to proof at trial or other appropriate proceeding. Pursuant to 15 U.S.C. § 15, PSI is entitled to treble that amount in damages, as well as costs of suit, including a reasonable attorney's fee.

62.     Because PPG Aerospace's prohibition against repackaging is ongoing, continuing to inflict harm on repackaging resellers such as PSI, PSI is entitled to a permanent injunction forbidding PPG Aerospace to prohibit repackaging and ameliorating the effects of its improper prohibition.

## **COUNT THREE**

### **(Tying 15 U.S.C. § § 1,2 & 14)**

### **(Against all Defendants)**

63.    PSI incorporates by reference each and every allegation above as if set forth in full at this point.

64.    Aerospace sealants and the end-user packaging they come in are two separate products.  That reality is evidenced by, among other things, the fact that, for years before PPG Aerospace prohibited repackaging, PSI and other resellers would purchase aerospace sealants from PPG Aerospace but then separately order empty injection kits, sometimes from third-party companies like Techon, and then repackage the PPG Aerospace sealant into the injection kit in order to deliver a ready-to-use injection kit filled with components of aerospace sealant to the end-user.

65.    Upon prohibiting repackaging, PPG Aerospace coerced purchasers to purchase the end-user packaging from PPG Aerospace simultaneously with its sealants, because PPG Aerospace purported to forbid the purchaser from placing the sealant into any other package.

66.    Because, as alleged above, PPG Aerospace has monopoly power in the market for the production of aerospace sealants in the United States, and thus monopoly power over the aerospace sealants themselves, purchasers were compelled to purchase the end-user packaging from PPG Aerospace in order to obtain PPG Aerospace sealants when, absent the prohibition, they could and often would have purchased the two products separately.

67.    As alleged above, PPG Aerospace's prohibition affected the tens of millions of sales made to repackaging resellers like PSI, as well as the hundreds of millions of sales made in the market for the distribution of aerospace sealants annually.

68.    PPG Aerospace has an economic interest not only in the aerospace sealant that it sells but the end-user packaging it sells, for when it sells the two products together it receives the revenues for both of them.

69.    As a result of this misconduct, PSI was harmed by losing profits on aerospace sealant sales that it would have made but for PPG Aerospace's misconduct.  The precise amount of that harm is currently unquantified, and it is mounting daily, but is subject to proof at trial or other appropriate proceeding. Pursuant to 15 U.S.C. § 15, PSI is entitled to treble that amount in damages, as well as costs of suit, including a reasonable attorney's fee.

70.    Because PPG Aerospace's prohibition against repackaging is ongoing, continuing to inflict harm on repackaging resellers such as PSI, PSI is entitled to a permanent injunction forbidding PPG Aerospace to prohibit repackaging and ameliorating the effects of its improper prohibition.

## COUNT FOUR

### (Tying Cal. Bus. & Prof. Code §§ 16720, 16727)

### (Against all Defendants)

71.    PSI incorporates each and every allegation above as if set forth verbatim at this point.

72.    Aerospace sealants and the end-user packaging they come in are two separate and distinct products.  That reality is evidenced by, among other things, the fact that, for years before PPG Aerospace prohibited repackaging, PSI and other resellers would purchase aerospace sealants from PPG Aerospace but then separately order empty injection kits, sometimes from third-party companies like Techon, and then repack the PPG Aerospace sealant into the application kit in order to deliver a ready-to-use injection kit filled with components of aerospace sealant to the end-user.

73.    Upon prohibiting repackaging, PPG Aerospace coerced purchasers to purchase the end-user packaging with its sealants, because PPG Aeropspace

purported to forbid the purchaser from placing the sealant into any other package and thus had no realistic alternative for obtaining PPG Aerospace sealants other than purchasing the sealant and the packaging simultaneously to arrive in a single package from PPG Aerospace.

74.   As alleged above, PPG Aerospace has monopoly power in the market for the production of aerospace sealants in the United States, which is sufficient economic power in the market for aerospace sealants to coerce at least some consumers into purchasing the end-user packaging from PPG Aerospace as well as the aerospace sealant it contains at the same time.

75.   As alleged above, PPG Aerospace's prohibition affected the tens of millions of sales made to repackaging resellers like PSI, as well as the hundreds of millions of sales made in the market for the distribution of aerospace sealants annually.

76.   PPG Aerospace's misconduct was a substantial factor in causing PSI harm in the form of lost profits on aerospace sealant sales that it would have made but for PPG Aerospace's misconduct.  The precise amount of that harm is currently unquantified, and it is mounting daily, but is subject to proof at trial or other appropriate proceeding.  Pursuant to Cal. Bus. & Prof. Code § 16750, PSI is entitled to treble that amount in damages, as well as costs of suit, including a reasonable attorney's fee.

77.   Because PPG Aerospace's prohibition against repackaging is ongoing, continuing to inflict harm on repackaging resellers such as PSI, PSI is entitled to a permanent injunction forbidding PPG Aerospace to prohibit repackaging and ameliorating the effects of its improper prohibition.

COMPLAINT & JURY DEMAND

## **COUNT FIVE**

**(Intentional Interference with Prospective Economic Advantage)**

**(Against all Defendants)**

78.    PSI incorporates by reference each and every allegation above as if set forth in full at this point.

79.    PSI had relationships with its customers and prospective customers that probably would have resulted in an economic benefit to PSI when such customers and prospective customers would have purchased aerospace sealants from PSI.

80.    PPG Aerospace was well aware of those relationships, having communicated with PSI personnel repeatedly about PSI's activities and having both competed with PSI for sales to those customers and having provided customer support to PSI with respect to those sales.

81.    As alleged above, PPG Aerospace intended to disrupt those relationships when it prohibited repackaging, as evidence in part by its long-term campaign to eliminate PSI as a competitor.

82.    PPG Aerospace engaged in wrongful conduct by prohibiting repackaging and thus tying the purchase of end-user packaging to the purchase of aerospace sealant.

83.    PPG Aerospace's prohibition against repackaging disrupted PSI's relationships with its customers and prospective customers because PSI was no longer able to sell many of its customers repackaged aerospace sealant and thus no longer in a position to provide the previously available kind of superior customer service by quickly providing customers with exactly the amount of aerospace sealant they wanted in precisely the configuration they desired.

84.    PPG Aerospace's prohibition against repackaging was thus a substantial factor in causing harm to PSI.  That harm consists of the profits PSI lost on aerospace sealant sales that it would have made but for PPG Aerospace's

misconduct.  The precise amount of that harm is currently unquantified, and it is mounting daily, but is subject to proof at trial or other appropriate proceeding.

85.     In prohibiting repackaging, PPG Aerospace acted with oppression, fraud or malice towards PSI, thus meriting an award of punitive and exemplary damages in an amount subject to proof.

## COUNT SIX

### (Secret Unearned Discounts Cal. Bus. & Prof. Code § 17027 )
### (Against all Defendants)

86.     PSI incorporates by reference each and every allegation above as if set forth in full at this point.

87.     During the three years before the filing of this complaint, PPG Aerospace purported to charge PSI the same price it charged other resellers purchasing on like terms and conditions pursuant to PPG Aerospace's published price list.

88.     In fact, PPG Aerospace charged a number of those resellers less than it charged PSI for sales on like terms and conditions to PSI's purchases by granting unearned discounts to those other resellers.

89.     These unearned discounts were secret in that they were not disclosed by PPG Aerospace to disfavored buyers and were not disclosed on PPG's price list, which purported to set forth the prices charged all resellers buying on like terms and conditions.

90.     PPG Aerospace's secret unearned discounts were a substantial factor in harming PSI when the improperly favored resellers paid less than PSI for aerospace sealant and used those unearned discounts to underbid PSI for sales.

91.     PPG Aerospace's secret unearned discounts tended to destroy competition by creating obstacles for disfavored resellers.  Further, PSI was by far the largest reseller and thus one that created the most competitive discipline for PPG Aerospace and the prospect of greater competitive discipline in the future.

By disfavoring PSI on secret unearned discounts, PPG Aerospace sought to achieve and achieved the goal of undermining competitive discipline in the market for the distribution of aerospace sealants.

92.     PPG Aerospace's misconduct was a substantial factor in causing PSI harm in the form of lost profits on aerospace sealant sales that it would have made but for PPG Aerospace's misconduct.  The precise amount of that harm is currently unquantified, and it is mounting daily, but is subject to proof at trial or other appropriate proceeding.  Pursuant to Cal. Bus. & Prof. Code § 17082, PSI is entitled to treble that amount in damages, as well as costs of suit, including a reasonable attorney's fee.

93.     Because PPG Aerospace's secret unearned discounts are ongoing, continuing to inflict harm on repackaging resellers such as PSI, PSI is entitled to a permanent injunction forbidding PPG Aerospace to grant secret unearned discounts to resellers and ameliorating the effects of its previous use of secret unearned discounts.

## COUNT SEVEN

### (Unfair Competition Cal. Bus. & Prof. Code § 17200 *et. seq.*)
### (Against all Defendants)

94.     PSI incorporates by reference each and every allegation above as if set forth in full at this point.

95.     PPG Aerospace's prohibition against repackaging was unfair in that it, at the very least, threatened an incipient violation of federal and California antitrust and trade practices law and violated the spirit of those laws because the effects of that prohibition are comparable to a violation of those laws. Further, PPG Aerospace's prohibition significantly threatened to harm and actually harmed competition in the market for the distribution of aerospace sealants.

96.     PPG Aerospace and PSI were and are direct competitors for sales of aerospace sealants.  PPG Aerospace's prohibition against repackaging concretely

harmed PSI in the form of profits PSI lost on aerospace sealant sales that it would have made but for PPG Aerospace's misconduct.

97.   Because PPG Aerospace's secret unearned discounts and prohibition against repackaging are ongoing, continuing to inflict harm on repackaging resellers such as PSI, PSI is entitled to a permanent injunction forbidding PPG Aerospace to grant secret unearned discounts to resellers, reversing PPG Aerospace's ban on repackaging, and ameliorating the effects of its previous misconduct.

98.   PSI is entitled to costs of suit on this count, including a reasonable attorney's fee, because it is acting as a private attorney general to bring PPG Aerospace's conduct into compliance with the law for benefit of end-users, other resellers, and the industry generally.

## PRAYER FOR RELIEF

### (On All Causes of Action)

**WHEREFORE**, Plaintiff prays that the Court issue a judgment in its favor against Defendants ordering as follows:

(A)   Defendants' misconduct violated applicable and specified laws.

(B)   On the first, second, third, fourth, and sixth counts, treble the amount of actual damages incurred.

(C)   On the first, second, third, fourth, sixth, and seventh counts, costs of suit, including a reasonable attorney's fee.

(D)   On the fifth count, actual damages incurred.

(E)   On the fifth count, an award of punitive and exemplary damages.

(F)   On the first, second, third, fourth, fifth, and seventh count, a preliminary and permanent injunction enjoining Defendants and their officers, directors, principals, agents, servants, employees, successors, and assigns, and all persons and entities in active concert or participation with them, from engaging in any of the activity complained of herein or from causing any of the injury

complained of herein and from assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activity complained of herein or from causing any of the injury complaint of herein, and directing all of the above to take steps to ameliorate the impact of their wrongful conduct.

     (G)    For costs of suit; and

     (F)    For such other relief that the Court deems just and reasonable.

## **JURY DEMAND**

Plaintiff Packaging Systems, Inc. demands a trial by jury.

Respectfully submitted,

DATED:  December 8, 2016     **GREEN & NOBLIN, P.C.**

By:  _____ /s/ James Robert Noblin _____
          James Robert Noblin

James Robert Noblin (SBN 114442)
**GREEN & NOBLIN, P.C.**
4500 East Pacific Coast Highway, Fourth Floor
Long Beach, California  90804
Telephone:  (562) 391-2487
Email: gnecf@classcounsel.com

Laurence C. Osborn (State Bar No. 155209)
losborn@bknlawyers.com
Kenneth F. Spencer (State Bar No. 140982)
kspencer@bknlawyers.com
**Baker, Keener & Nahra**
633 West Fifth Street,
Los Angeles, California  90071
Telephone:  (213) 241-0900

*Attorneys for Plaintiff*
Packaging Systems, Inc

COMPLAINT & JURY DEMAND

**EXHIBIT A**



PRC-DeSoto International, Inc.
12780 San Fernando Road
Sylmar, CA 91342
T: (818) 362-6711

ppgaerospace.com

**To: All PPG Sealant Resellers and Distributors**

This letter confirms PPG policy concerning the repackaging of its aerospace sealants. Repackaging of PPG aerospace sealants is prohibited. PPG aerospace sealants must only be packaged by PPG at PPG's manufacturing facilities and Application Support Centers. This policy includes, but is not limited to, all "PR" and "PS" branded sealants, aerospace sealants sold under the PPG or PRC DeSoto label, and any other aerospace sealants manufactured by PPG.

PPG is committed to ensuring that all customers receive product that meets their requirements. As part of its aerospace sealant product development and packaging quality control program, PPG maintains strict design and qualification standards for all of its sealant packaging containers. PPG also carefully inspects its packaging containers to ensure that they meet PPG quality standards. For these reasons, PPG quality certifications apply only to product that is manufactured and packaged with PPG oversight. Additionally, PPG only warrants sealant products that it packaged. PPG's warranty is void upon re-packaging of its sealant products for resale.

This policy must be strictly followed. Noncompliance may result in immediate severance of PPG business relationships.

Issued: August 16, 2016

**EXHIBIT B**

**From:** "Romano, James" <James.Romano@ppg.com>
**Date:** August 31, 2016 at 11:40:13 AM PDT
**To:** Steve <steve@pkgsys.net>
**Cc:** "Garibay, Mike" <mike.garibay@ppg.com>
**Subject: RE: PPG Letter**


Dear Steve,

In reference to your questions below, please refer to PPG's policy letter communicated to you on 16 August and Mike Garibay's response from 26 August (also below).  The information already provided is sufficient to adequately address your questions.  As Mike indicated in his correspondence, PPG will work with PSI, within the parameters he outlined, to address any existing inventory or in-process order issues.  Beyond that, we consider the matter closed.

Thank you,

Jim


**James M. Romano**
**Business Manager – ASC Los Angeles**
**PPG Aerospace**
**PPG**

ASC Los Angeles
24811 Avenue Rockefeller
Valencia, CA, USA 91355
T: 661-678-4217
M: 818-633-1750

F: 818-678-4321
ppg.com



-----Original Message-----
From: Steve [mailto:steve@pkgsys.net]
Sent: Friday, August 26, 2016 2:32 PM
To: Garibay, Mike
Cc: Enochs, Jim; Romano, James; James, Renae; rgray@pkgsys.net; Cain, Uyen Thy
Subject: RE: PPG Letter


Hello Mike,


Thank you for your reply. I still have some questions, However.


1. Is this a new policy or just a continuation of a prior policy?

2. If it is a new policy, please explain the reason. Did my customers ever complain to PPG, for example? If I need to correct my business operations, I am willing to do that immediately.

3. Will PSI in the future ever be able to repackage your products and if so, under what conditions?

4. Will PPG sell PSI any Semco Semkits for repackaging of PPG sealants?

5. Also can you clarify, on the products that the PPG ASC's buy from PSI, is PSI's packaging quality control program and inspection of product that goes out the door to your PPG ASC centers, approved with the PSI oversight?


Regards

Steve Gray

Packaging Systems Inc
26435 Summit Circle
Santa Clarita, Ca 91350

661-253-5700 ph

www.pkgsys.net


-----Original Message-----
From: Garibay, Mike [mailto:mike.garibay@ppg.com]
Sent: Friday, August 26, 2016 8:20 AM
To: Steve Gray
Cc: Enochs, Jim; Romano, James; James, Renae; rgray@pkgsys.net; Cain, Uyen Thy
Subject: Re: PPG Letter

Steve,


Thank you for reaching out with your questions last Friday. The policy letter does apply to all PPG aerospace sealants, including the sealants purchased by Packaging Systems. PPG's procurement practices are not affected by this policy.


For any Semco products that Packaging Systems currently has on order to PPG with the intention of use for repackaging PPG sealants, we would be willing to accept an order cancellation as long as it is at least 3 days prior to the confirmed ship date. For any PPG sealants that Packaging Systems currently has on order to PPG with the intention of repackaging, PPG would be willing to accept an order cancellation as long as it is received at least 2 weeks prior to the confirmed ship date. For any items that you would like to cancel that already are within the 2-week timeframe as of today, please let us know and we will be happy to review the situation and discuss with you.


For any PPG sealants that Packaging Systems already has purchased and received from PPG with the intention of repackaging, PPG is willing to accept their return for a full credit so long as they are in full case quantities in the original, unopened containers. For any sealants to be returned please ensure that they have at least 65% of the shelf life remaining from the date of packaging as shown on the PPG label. In order to preserve the remaining shelf life, please let us know within 7 business days if you will be returning any sealants already in your possession.


Lastly, PPG completes a variety of custom packaging for certain of its customers. If you can let us know the specifics on the requested container size and product, we would be happy to review.

Please let me know if you have any further questions.


Regards,


Mike

Mike Garibay

Sr. Sales and Market Development
Application Support Center-Los Angeles
PPG Aerospace
661.857.1727

On Aug 22, 2016, at 12:25 PM, Steve Gray
<steve@pkgsys.net<mailto:steve@pkgsys.net>> wrote:

Hello Jim


Thank you for the response, I look forward to hearing back from Mike.

Regards
Steve



Sent from my iPhone

On Aug 22, 2016, at 12:10 PM, Enochs, Jim
<jim.enochs@ppg.com<mailto:jim.enochs@ppg.com>> wrote:

Steve,
I am not your sales rep and I did not send you that letter. I am the Segment Manager
for Semco products for The Americas. You are a long term customer, so I will do what I
can to help get the answers to your questions. It may take a few days. I believe Mike
Garibay is your sales rep and he will most likely want to be the one to respond to you,
so I put him on copy.
Best Regards,

Jim Enochs
Segment Manager- The Americas
Semco Packaging and Application Systems

PPG Aerospace

12780 San Fernando Road

Sylmar, CA, USA, 91342

Mobile:310-766-3828

Email: jim.enochs@ppg.com<mailto:jim.enochs@ppg.com>

Web: www.ppgaerospace.com<http://www.ppgaerospace.com>

Optionalwebsite: www.semcopackaging.com<http://www.semcopackaging.com>

<image002.jpg>


From: Steve [mailto:steve@pkgsys.net]

Sent: Friday, August 19, 2016 11:19 AM

To: Enochs, Jim

Cc: Romano, James; James, Renae; rgray@pkgsys.net<mailto:rgray@pkgsys.net>

Subject: PPG Letter

Hello Jim,

Please see attached letter from Packaging Systems Inc, I would appreciate a response asap.


Regards

Steve Gray

Packaging Systems Inc

26435 Summit Circle

Santa Clarita, Ca 91350

661-253-5700 ph

661-253-9190 fax

www.pkgsys.net<http://www.pkgsys.net>