# United States District Court
# Central District of California

| | |
|---|---|
| PACKAGING SYSTEMS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>PRC-DESOTO INTERNATIONAL, INC.; and PPG INDUSTRIES, INC.,<br><br>    Defendants. | Case № 2:16-cv-09127-ODW(JPRx)<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS [34]** |

## I. INTRODUCTION

This is an antitrust action involving competitors in the aerospace sealant industry. Defendants PRC-Desoto International, Inc. and PPG Industries, Inc. (collectively "PPG") manufacture and distribute aerospace sealant for use in military and commercial aircraft. Plaintiff Packaging Systems, Inc. purchases wholesale quantities of aerospace sealant from PPG, repackages the sealant into special injection kits, and sells the kits on the retail market (usually to aircraft maintenance companies).

In August 2016, PPG issued a memo stating that the repackaging of its aerospace sealant for the purposes of resale was prohibited, and that it would stop selling sealant to any reseller that violated this prohibition. Plaintiff subsequently filed this action, alleging violations of state and federal antitrust and unfair competition laws. PPG now moves to dismiss Plaintiff's Second Amended Complaint

("SAC"). (Mot., ECF No. 34.) For the reasons discussed below, the Court **DENIES** its Motion.[1]

## II.   BACKGROUND

### A.   Uses of Aerospace Sealant

PPG manufactures and distributes aerospace sealant. (SAC ¶ 29, ECF No. 33.) Aerospace sealant has a variety of uses on aircraft, including sealing fuel tanks, smoothing surfaces, and preventing moisture intrusion. (*Id.* ¶ 13.) Obviously, it is important that aerospace sealant be able to withstand a number of harsh environmental conditions, such as wide variations in temperature and pressure, inclement weather, ultraviolet light, noise, vibration, abrasion, moisture, fatigue, and high g-forces. (*Id.*) Because of this, aircraft manufacturers issue stringent specifications for any aerospace sealant used on their aircraft, and maintain a list of qualified products that meet these requirements. (*Id.* ¶¶ 17–18.) To land on a manufacturer's qualified product list ("QPL"), the sealant must pass rigorous testing at either Wright-Patterson Air Force Base or the Federal Aviation Administration. (*Id.* ¶ 18.) End-users of aerospace sealant—usually aircraft maintenance companies—will virtually never use non-QPL sealant for safety and liability reasons. (*Id.*)

Aerospace sealant comes from the manufacturer as separate pastes that must be mixed together prior to use. (*Id.* ¶¶ 15–16.) Once mixed, there is a relatively short window in which the mixture can be applied to the aircraft—sometimes as short as half an hour. (*Id.*) After the mixture's "working time" has passed, any excess mixture is unusable and must be discarded. (*Id.* ¶ 15.) End-users can mix sealant either by manually mixing the pastes or by using an injection kit. (*Id.* ¶ 16.) An injection kit is a disposable syringe-like tool that stores the pastes in separate compartments and mixes them together when its plunger is depressed. (*Id.* ¶¶ 16, 38.) Not only do injection kits simplify the mixing process, they reduce waste by mixing only the exact

---

[1] After considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.

amount of sealant needed for one sitting. (*See id.*) However, filling kits with sealant is itself a difficult and labor-intensive process, and thus end-users tend to prefer purchasing the kits pre-filled. (*Id.* ¶ 42.)

## B. Production of Aerospace Sealant

Plaintiff alleges that the production of aerospace sealant is its own unique market. (*Id.* ¶¶ 21–28.) That is, there are no adequate substitutes for QPL-approved aerospace sealants because the properties of aerospace sealant are unique to the needs of aircrafts, and because aerospace sealant must undergo rigorous testing not required of non-aircraft sealants. (*Id.* ¶¶ 21–22.) Pricing for aerospace sealants is therefore highly inelastic. (*Id.* ¶¶ 26–28.)

PPG produces over 90% of the aerospace sealant manufactured and used in the United States. (*Id.* ¶ 29.) According to Plaintiff, PPG is able to maintain such market dominance for two reasons. First, high barriers to entry prevent new competitors from entering the market. (*Id.* ¶ 31.) These barriers include "hundreds of millions of dollars" in startup costs, long delays in profit realization, entrenched distribution networks among preexisting producers, and intellectual property held by such producers covering critical production processes. (*Id.*) Second, PPG has consolidated its power in the market by continuously acquiring other companies in the aerospace sealant industry and the general aerospace industry—including SEMCO, which is one of the two main manufacturers of injection kits.[2] (*Id.* ¶¶ 34–35, 38–39.) This makes PPG a "one-stop shop" for all aerospace products, thus discouraging customers from shopping around for any one particular product. (*Id.* ¶ 35.)

## C. Distribution of Aerospace Sealant

PPG sells sealant in both wholesale and retail quantities. (*Id.* ¶¶ 1, 36.) Generally, resellers buy wholesale quantities of sealant from PPG to sell at retail price to end-users, usually after repackaging the sealant into injection kits. (*Id.* ¶¶ 36, 40.) PPG also sells retail quantities of sealant directly to end-users, including sealant

---

[2] The other being Techon. (*Id.* ¶¶ 38, 39.)

packaged into injection kits. (*Id.* ¶¶ 51–53.) PPG uses "application support centers" ("ASCs") to package its sealant. (*Id.* ¶ 53.) These ASCs used to be independent repackaging companies before PPG acquired them. (*Id.* ¶ 51.) According to Plaintiff, PPG's ASCs continue to use the same repackaging procedure that they did prior to being acquired. (*Id.* ¶ 53.)

Plaintiff has been a sealant repackager and reseller since 1976. (*Id.* ¶ 40.) Like other resellers, Plaintiff purchases sealant wholesale from PPG, purchases injection kits from either SEMCO or Techon, fills the kits with sealant, and sells them ready-to-use to the end-user. (*Id.*) Thus, Plaintiff competes with PPG in the retail distribution market. (*Id.* ¶¶ 51–53.) Plaintiff alleges that it has a competitive edge over PPG and other resellers in this market because it (1) maintains a substantial and varied inventory of repackaged sealants and (2) provides end-users with superior customer service. (*Id.* ¶¶ 41–42.) By 2015, Plaintiff was generating approximately $10 million in annual revenue from reselling PPG's sealants. (*Id.* ¶ 40.)

Over the years, PPG has attempted to blunt competition in the retail distribution market. This includes: (1) "express[ing an] interest" on more than one occasion in acquiring Plaintiff and turning it into an ASC (*id.* ¶ 58); (2) telling end-users, most notably in 2001 and 2012, that Plaintiff and other non-PPG resellers were not authorized to repackage PPG sealant, even though at that time PPG had no policy against repackaging (*id.* ¶¶ 1, 59); and (3) increasing the per-unit price of sealant sold in bulk quantity at a faster rate than the per-unit price of sealant sold in retail quantity, which was against industry norm (*id.* ¶ 60).

**D.    PPG's Repackaging Prohibition**

In August 2016, PPG sent a memo to all of its sealant resellers and distributors, wherein it "confirm[ed] PPG policy" prohibiting the repackaging of its sealants by anyone other than PPG or its ASCs. (*Id.* ¶ 45, Ex. A.) PPG stated that this policy was necessary to ensure the sealant's quality for end-users, and that it would refuse to sell sealant to any reseller that violated this policy. (*Id.*) Plaintiff requested clarification

from PPG on the policy, including the reason for the policy and whether Plaintiff could "correct [its] business operations" to alleviate PPG's concerns. (*Id.*, Ex. B.) PPG declined to give a direct answer. (*Id.*)

Plaintiff alleges that the quality-control rationale is simply pretext, and that the real reason for this policy is to eliminate the increasingly successful competition in the retail market from non-PPG resellers. (*Id.* ¶ 53.) Plaintiff contends that there is no safety advantage to keeping repackaging in-house at PPG, as evidenced by the fact that its ASCs follow the exact same repackaging procedure that they did before PPG acquired them, and the fact that there were "no significant quality issues" associated with repackaging in the many decades that external repackaging had been around. (*Id.*) Moreover, given PPG's virtual monopoly in the production market, Plaintiff contends that this new policy will allow PPG to monopolize the retail distribution market as well—and in fact has already "vastly reduced" the amount of repackaged aerospace sealant sales by both Plaintiff and other non-PPG repackagers. (*Id.* ¶ 46.) Plaintiff filed this action soon thereafter.

**E.    PPG's Motions to Dismiss**

Plaintiff asserts the following claims: (1) monopolization in violation of the Sherman Act, 15 U.S.C. § 2; (2) attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2; (3) tying in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, 4; (4) tying in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16727; (5) secret unearned discounts in violation of the California Unfair Practices Act, Cal. Bus. & Prof. Code § 17045; and (6) unfair competition in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200. (*See generally* SAC.) On February 23, 2017, PPG moved to dismiss all of Plaintiff's claims in its First Amended Complaint. (ECF No. 13.) The Court granted in part and denied in part PPG's motion, dismissing Plaintiff's tying claims with leave to amend. (ECF No. 31.) On August 4, 2017, Plaintiff filed the SAC, adding new allegations related to its tying claims. (SAC ¶¶ 63–88, Counts III and IV.) PPG now moves to

dismiss Plaintiff's tying claims as alleged in the SAC. (Mot. 1.)

### III. LEGAL STANDARD

A court may dismiss a complaint for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. Fed. R. Civ. P. 12(b)(6); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a dismissal motion, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). But a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). The court must grant the plaintiff leave to amend if there is any possibility that amendment could cure the deficiencies, even if the plaintiff fails to request such leave. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc).

### IV. DISCUSSION

PPG argues that Plaintiff does not satisfy any of the elements of a tying claim under either the Sherman Act or California's Cartwright Act.

"A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008). "To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product). Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the

seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Id.* (citations and footnotes omitted).

"Both Section 1 [of the Sherman Act] and the Cartwright Act prohibit illegal tying arrangements," and the elements of a § 1 tying claim for the most part mirror that of the Cartwright Act. *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1222 (C.D. Cal. 2012). "'For a tying claim to suffer per se condemnation, a plaintiff must prove (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market.'" *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (quoting *Cascade Health*, 515 F.3d at 913).

PPG argues that Plaintiff's tying claims are inadequate because (1) Plaintiff fails to allege a plausible relevant market for the tied product; (2) Plaintiff does not allege that PPG coerced customers to buy a tied product; (3) the tying and tied products Plaintiff alleges are not distinct products; and (4) Plaintiff has not plausibly alleged harm to competition. (Mot. 1–2.) The Court addresses each argument in turn.

### A. Market for the Tied Product

In the Order on PPG's first motion to dismiss, the Court dismissed Plaintiff's tying claim, because Plaintiff had failed to adequately define the tied product market. (Order 13, ECF No. 31.) In its previous pleading, Plaintiff defined the tied product market as "end-user packaging" and identified injection kits as an example of such packaging. (*See id.*) The Court found this definition insufficient, because it was not clear whether injection kits were simply one example of "end-user packaging" or if injection kits constitute the entire universe of "end-user packaging." Plaintiff corrected this deficiency in the SAC.

An antitrust complaint must define the relevant market for both the tying and the tied product. *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1176 (N.D. Cal. 2013);

*In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 993 (N.D. Cal. 2010); *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). A product market comprises "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 406 (1956). A complaint should be dismissed under Rule 12(b)(6) only where "the complaint's 'relevant market' definition is facially unsustainable." *Newcal Indus.*, 513 F.3d at 1045. Such a "facially unsustainable" relevant market definition may include cases where "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Colonial Med. Grp., Inc. v. Catholic Healthcare W.*, No. C-09-2192 MMC, 2010 WL 2108123, at *3 (N.D. Cal. May 25, 2010) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).

Plaintiff defines the tied product market as end-user packaging consisting of injection kits, syringes, and pint and quart cans in which aerospace sealant can be placed and sold to end-users. (SAC ¶ 67.) PPG argues that this alleged product market is "facially unsustainable" because the products included within the product market do not have "reasonable interchangeability" and are not "substitutes" from the perspective of aerospace sealant consumers. The Court disagrees.

Plaintiff has addressed potential substitutes and identified the economic factors that render large, unspecialized aerospace sealant drums and pails unsuitable as substitutes for end-user packaging. (SAC ¶¶ 16, 37–40, 42, 64–75.) That the specific types of end-user packaging Plaintiff identifies are not substitutes for each other does not render the product market unsustainable due to the commercial realities of the aerospace sealant market. *See United States v. Grinnell*, 384 U.S. 563, 572 (1966) ("We see no barrier to combining in a single market a number of different products or

services where that combination reflects commercial realities"); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203–04 (9th Cir 1997) ("Consideration of the 'commercial realities' in the markets for Kodak parts compels the use of an 'all parts' market theory"). Plaintiff alleges that end users buy aerospace sealant in injection kits, syringes, and cans, because it would be wasteful and cost-prohibitive for them to purchase aerospace sealant in larger drums. (SAC ¶ 64.) Additionally, each product is equally subjected to PPG's recent policy of terminating the supply of aerospace sealant to repackagers. (*Id.* ¶ 68.) These allegations of commercial realities are sufficient for the purposes of defining the relevant product market at the pleading stage.

The ambiguity in the definition of the product market that concerned the Court in its previous order is no longer present. Therefore, the Court finds that Plaintiff has sufficiently defined the tied product market to survive the pleading stage.

**B.     Coercion**

The Court previously found that Plaintiff adequately plead the coercion element of its tying claims based on the assumption that Plaintiff's definition of the tied product market was limited to injection kits. PPG now argues that because Plaintiff defines the tied product market more broadly—to include syringes and cans as well as injection kits—its coercion claim must fail, because PPG must sell aerospace sealant in *some* type of packaging. (Mot. 34.) Plaintiff, however, does not define the tied product market to include *all* packaging. Rather, Plaintiff alleges that PPG improperly seeks to control both the markets for aerospace sealant and end-user packaging by forcing consumers to buy both products from them.

As explained in the previous Order: PPG has significant leverage over its customers to dictate the terms on which they must purchase sealant. The facts in the complaint plausibly show that PPG's anti-repackaging policy coerces resellers to purchase injection kits, syringes, or cans from PPG with the sealant. Resellers, who flourished in the retail distribution market by satisfying the end-user's need for pre-

filled injection kits, can no longer provide this service due to PPG's anti-repackaging policy. So, consumers are forced to buy both the sealant and the kits/syringes/cans from PPG. These allegations are sufficient to plead coercion. *See Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir. 2015) ("When a defendant adopts a policy that makes it unreasonably difficult or costly to buy the tying product (over which the defendant has market power) without buying the tied product from the defendant, it 'forces' buyers to buy the tied production from the defendant and not from competitors.").

### C. Whether Tying and Tied Products are Distinct

PPG also argues that Plaintiff's tying and tied products, as alleged, are not distinct products, because aerospace sealant must be sold in some type of packaging. (Mot. 7–8.) As explained above, however, Plaintiff does not define the tied product to include all types of packaging. In its SAC, Plaintiff distinguishes end-user packaging from the larger, wholesale packaging such as 50-gallon drums. (SAC ¶ 64.)

PPG also contends that the two products are not separate because Plaintiff does not allege that the injection kits/syringes/cans are ever sold without aerospace sealant. (Mot. 8.) Whether the end-user packaging and the aerospace sealant are two separate products is undeniably a close question, because one of the component parts of the end-user packaging, as defined by Plaintiff, is always aerospace sealant. Neither party cites a case on all fours with the facts presented here.

Therefore, the Court applies the test articulated by the Supreme Court in *Jefferson Parish*. The Supreme Court held that "the answer to the question whether one or two products are involved" does not turn "on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984). In other words, the mere fact that two items are complements, that "one . . . is useless without the other," does not make them a single "product" for purposes of tying law. *United States v. Microsoft Corp.*, 253 F.3d 34, 86 (D.C. Cir. 2001) (citing *Jefferson Parish*, 466 U.S. at 2). Instead, the

primary inquiry is whether the seller has foreclosed competition on the merits in a product market distinct from the market for the tying item. *Jefferson Parish*, 466 U.S. at 21. This is what PPG has done here. With its anti-repackaging policy, PPG attempts to foreclose competition in the market of selling sealants in injection kits/syringes/cans and that market is separate from the market for wholesale sealant. Plaintiff has adequately pleaded that there is sufficiently distinct demand for end-user packaging separate from the demand for aerospace sealant.

**D.     Harm to Competition**

PPG argues that Plaintiff's tying claim must fail because it has failed to allege injury to competition in the market for the tied product. (Mot. 8.) In its previous Order, the Court dismissed Plaintiff's tying claim, in part, because Plaintiff had failed to demonstrate a "plausible link between reduced competition in the retail distribution market and reduced competition in the [end-user packaging] market." (Order 16.)

"The injury caused by an unlawful tying arrangement is 'reduced competition in the market for the tied product.'" *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1089 (9th Cir. 2009) (quoting *Rick-Mik Enters.*, 532 F.3d at 971). "Thus, the inquiry is 'whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie.'" *Id.* (quoting *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501 (1969)). "[A] plaintiff must allege and ultimately prove facts showing a significant negative impact on competition in the tied product market." *Sidibe*, 4 F. Supp. 3d at 1179 (internal quotation marks omitted).

The Court finds that Plaintiff has corrected the deficiency addressed in the previous Order and has adequately alleged harm to competition in the tied-product market. Plaintiff alleges:

> As a result of PPG Aerospace's prohibition on repackaging, a non-insubstantial volume of the sale of non-PPF injection kits, syringes, and cans has decreased because reseller purchasers reasonably do not want to risk being cut-off from

> what is effectively their sole source of supply for aerospace sealants by running afoul of the repackaging prohibition. In the absence of repackaging, these resellers have no need for injection kits, syringes, and cans, because they previously purchased those items as part of the repackaging process that end-users demanded.

(SAC ¶ 74.) Plaintiff also alleges that "purchasers were compelled to purchase the end-user packaging from PPG [] in order to obtain PPG [] sealants when, absent the prohibition, they could and often would have purchased the two products separately." (*Id.* ¶ 73.) As a result, Plaintiff alleges that PPG's "conduct in tying the sale of aerospace sealant to the sale of end-user packaging affected the tens of millions of sales made to repackaging resellers like [Plaintiff], as well as the hundreds of millions of sales made in the market for the distribution of aerospace sealants annually." (*Id.* ¶ 76.) These allegations, taken together, are sufficient to plead harm to competition and allow Plaintiff to survive the pleading stage.

## V. CONCLUSION

For the reasons discussed above, the Court **DENIES** PPG's Motion. (ECF No. 34.)

**IT IS SO ORDERED.**

February 6, 2018

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**